**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AIP ACQUISITION LLC, | ) |
| | ) |
| Plaintiff | ) C.A. No. 12-617-GMS |
| | ) C.A. No. 12-1688-GMS |
| v. | ) C.A. No. 12-1689-GMS |
| | ) C.A. No. 12-1690-GMS |
| LEVEL 3 COMMUNICATIONS, LLC, | ) C.A. No. 12-1691-GMS |
| | ) C.A. No. 12-1692-GMS |
| v. | ) |
| | ) |
| CSC HOLDINGS, LLC, | ) **JURY TRIAL DEMANDED** |
| | ) |
| v. | ) |
| | ) |
| CHARTER COMMUNICATIONS, INC., and | ) |
| CHARTER COMMUNICATIONS HOLDING | ) |
| COMPANY, LLC, | ) |
| | ) |
| v. | ) |
| | ) |
| COMCAST CORPORATION, COMCAST | ) |
| CABLE COMMUNICATIONS, LLC, | ) |
| COMCAST CABLE COMMUNICATIONS | ) |
| MANAGEMENT, LLC, COMCAST IP PHONE, | ) |
| LLC, and COMCAST BUSINESS | ) |
| COMMUNICATIONS, LLC, | ) |
| | ) |
| v. | ) |
| | ) |
| COX COMMUNICATIONS, INC. and | ) |
| COXCOM, LLC, | ) |
| | ) |
| v. | ) |
| | ) |
| TIME WARNER CABLE INC., TIME | ) |
| WARNER CABLE LLC, TIME WARNER | ) |
| ENTERTAINMENT COMPANY, L.P., TWC | ) |
| COMMUNICATIONS, LLC, and TWC | ) |
| DIGITAL PHONE LLC, | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFF'S CLAIM CONSTRUCTION OPENING BRIEF**

Richard D. Kirk
Stephen B. Brauerman
Vanessa R. Tiradentes
Sara E. Bussiere
BAYARD, P.A.
222 Delaware Avenue
Suite 900
Wilmington, DE 19801
(302) 655-5000
rkirk@bayardlaw.com
sbrauerman@bayardlaw.com
vtiradentes@bayardlaw.com
sbussiere@bayardlaw.com

Kenneth L. Dorsney
MORRIS JAMES LLP
500 Delaware Avenue
Suite 1500
Wilmington, DE 19801
(302) 888-6800
kdorsney@morrisjames.com

*Of Counsel:*

COHEN & GRESSER LLP
800 Third Avenue, 21st Floor
New York, New York 10022
(212) 957-7600

*Attorneys for AIP Acquisition LLC*

Dated:  November 19, 2013

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................ 1

II. OVERVIEW OF ASSERTED PATENTS ......................................................... 2

    A. The '879 Patent ..................................................................................... 2

    B. The '579, '654, and '756 Patents ......................................................... 2

III. THE LAW OF CLAIM CONSTRUCTION ....................................................... 2

IV. DISPUTED CONSTRUCTIONS ........................................................................ 5

    A. '879 Patent ............................................................................................ 5

        1. Preamble ................................................................................... 5

        2. "Telecommunication protocol" / "Internet protocol" ............... 6

        3. "Signaling message" ............................................................... 11

        4. "Access device" / "First access device" / "Second access device" .......... 13

        5. "A further format suitable for the second access device" ......... 15

        6. "Receiving a transmission in a first format through a first communication network from a first access device" ............... 16

        7. "First communication network," "Analog telephone network" and "Digital telephone network" ......................................... 18

        8. "Sending the converted transmission . . . for reception by a second access device" ........................................................... 20

        9. "Telecommunication nodes" .................................................. 21

    B. '654, '579, and '756 Patents ............................................................... 23

        1. "In a manner transparent to a/the calling party and a/the called party" / "In a manner transparent to the calling party telephone user equipment and the called party telephone user equipment" / "In a manner transparent to the users of the calling party access number and the called party access number." ................................................... 23

        2. "Calling telephone equipment" / "Calling (party) telephone user equipment" ................................................................... 25

3.    "Calling location" ................................................................. 26

4.    "Transmitting to a control location identification for the calling telephone equipment and the called telephone equipment" / "Means for transmitting to a control location identification for the calling telephone equipment and the called telephone equipment" ..................... 27

5.    "Determining whether a call from the calling location to the called party access number should be connected via the telecommunication network" / "Means for determining whether a call from the calling location to the called party access number should be connected via the telecommunication network" .............................................. 29

6.    "Connecting the call from the calling party access number to the called party access number" / "Means for connecting the call from the calling party access number to the called party access number" ........ 31

7.    "An intercept" / "The intercept" ............................................. 33

8.    "Selecting a transmission path connecting a calling location and a called location" ...................................................................... 35

9.    "An intercept that selects a route passing through a control location for connecting a calling party telephone user equipment to a called party telephone user equipment" ............................................. 36

10.   "Access location" .................................................................... 36

11.   "Checking a status on each of a plurality of communication access locations each associated with said called party access number to determine which is accessible" .............................................. 38

V.    CONCLUSION .................................................................................. 39

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Advanced Fiber Technologies Trust v. J & L Fiber Services, Inc.*,
   674 F.3d 1365 (Fed. Cir. 2012) ................................................................................. 25

*AIP Acquisition LLC v. Level 3 Communications, LLC*,
   C.A. No. 12-617 ................................................................................................................... 1

*Budde v. Harley-Davidson, Inc.*,
   250 F.3d 1369 (Fed. Cir. 2001) ..................................................................................... 4

*Cablestrand Corp. v. Wallshein*,
   29 F.3d 644 (Fed.Cir.1994) ........................................................................................... 39

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH*,
   224 F.3d 1308 (Fed. Cir. 2000) ................................................................................... 26

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
   289 F.3d 801 (Fed. Cir. 2002) ....................................................................................... 5

*CCS Fitness, Inc. v. Brunswick Corp.*,
   288 F.3d 1359 (Fed. Cir. 2002) ................................................................................... 25

*Chef America, Inc. v. Lamb-Weston, Inc.*,
   358 F.3d 1371 (Fed. Cir. 2004) ................................................................................... 11

*CVI/Beta Ventures, Inc. v. Tura LP*,
   112 F.3d 1146 (Fed. Cir. 1997) ..................................................................................... 4

*Grape Tech. Group, Inc. v. Jingle Networks, Inc.*,
   Civ. A. No. 08-408 (GMS) (D.I. 35) (D. Del. Oct. 20, 2009) ................................... 1

*In re Katz Interactive Call Processing Patent Litig.*,
   639 F.3d 1303 (Fed. Cir. 2011) ................................................................................... 21

*In re Zletz*,
   893 F.2d 319 (Fed. Cir. 1989) ....................................................................................... 11

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
   256 F.3d 1323 (Fed. Cir. 2001) ................................................................................... 28

*L'Oréal S.A. v. Johnson & Johnson Consumer Cos., Inc.*,
   CV 12-98-GMS, 2013 WL 3788803 (D. Del. July 19, 2013) ..................................... 6

Page(s)

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
   358 F.3d 898 (Fed. Cir. 2004) ............................................................................... passim

*Linear Tech. Corp. v. Impala Linear Corp.,*
   379 F.3d 1311 (Fed. Cir. 2004) ...................................................................................... 4

*Markman v. Westview Instrs., Inc.,*
   52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996) .............................. 2

*McCarty v. Lehigh Val R.R.,*
   160 U.S. 110, 16 S.Ct. 240 (1895) ............................................................................... 18

*N. Telecom Ltd. v. Samsung Elecs. Co.,*
   215 F.3d 1281 (Fed. Cir. 2000) .............................................................................. 15, 37

*Netcraft Corp. v. eBay, Inc.,*
   549 F.3d 1394 (Fed. Cir. 2008) ...................................................................................... 4

*Novartis Pharm. Corp. v. Abbott Labs.,*
   375 F.3d 1328 (Fed. Cir. 2004) ...................................................................................... 4

*Omega Eng'g, Inc. v. Raytek Corp.,*
   334 F.3d 1314 (Fed. Cir. 2003) ...................................................................................... 4

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005) ............................................................................. passim

*Randall May Int'l, Inc. v. DEG Music Prods., Inc.,*
   378 Fed. Appx. 989 (Fed. Cir. 2010) .......................................................................... 38

*Renishaw PLC v. Marposs Societa' Per Azioni,*
   158 F.3d 1243 (Fed. Cir. 1998) ................................................................................ 3, 18

*Superguide Corp. v. DirecTV Enterprises, Inc.,*
   358 F.3d 870 (Fed. Cir. 2004) ..................................................................................... 28

*Symantec Corp. v. Computer Assocs. Int'l, Inc.,*
   522 F.3d 1279 (Fed. Cir. 2008) ...................................................................................... 6

*Teleflex, Inc. v. Ficosa N. Am. Corp.,*
   299 F.3d 1313 (Fed. Cir. 2002) ................................................................................ 3, 15

*Toro Co. v. White Consol. Indus., Inc.,*
   199 F.3d 1295 (Fed. Cir. 1999) ................................................................................... 22

*Vitronics Corp. v. Conceptronic, Inc.,*
   90 F.3d 1576 (Fed. Cir. 1996) .................................................................................. 4, 24

Page(s)

*Watts v. XL Sys., Inc.,*
    232 F.3d 877 (Fed. Cir. 2000) ............................................................................. 3

**Statutes**

35 U.S.C. § 112 ............................................................................................................ 4

**Other Authorities**

Andrew S. Tanenbaum, *Computer Networks* (4th ed. 1996) ....................................... 11

Bijan Jabbari, Common Channel Signalling System Number 7 for ISDN and
    Intelligent Networks, *Proceedings of the IEEE* (Feb. 1991), Vol. 79 ..................... 15

E. Bryan Carne, *Telecommunications Primer:  Signals, Building Blocks and Networks*,
    Prentice-Hall PTR (1995) ....................................................................................... 15

J.A. Pecar et al., *The McGraw-Hill Telecommunications Factbook*, McGraw-Hill
    (1993) ..................................................................................................................... 15

M.L. Gurrie and P.J. O'Connor, *Voice/Data Telecommunications Systems, An
    Introduction to Technology*, Prentice Hall (1986) .................................................. 15

McGraw-Hill Dictionary of Scientific and Technical Term (4th ed. 1989) ................. 26

R.J. Cherukuri and J.H. Derby, *Frame Relay:  Protocols and Private Network
    Applications*, IEEE (1989) ...................................................................................... 12

RFC 1594 (Network Working Group 1994) ............................................................... 11

RFC 791 (Internet Protocol, DARPA Internet Program Protocol Specification, 1981) ............... 11

RFC 793 (Transmission Control Protocol, DARPA Internet Program Protocol
    Specification, 1981) ............................................................................................... 11

Telecom:  TNA 102 (June 1996) ................................................................................ 14

The New Institute of Electrical and Electronics Engineers ("IEEE") Standard
    Dictionary of Electrical and Electronics Terms (IEEE Std 100-1992) (5th ed. 1993) ............... 8

## I.      INTRODUCTION

To manufacture a non-infringement strategy, Defendants CSC Holdings, LLC, Charter Communications Inc., Charter Communications Holding Company LLC, Comcast Corporation, Comcast Cable Communications, LLC, Comcast Cable Communications Management, LLC, Comcast IP Phone, LLC, Comcast Business Communications, LLC, Cox Communications, Inc., CoxCom, LLC, Time Warner Cable Inc., Time Warner Cable Enterprises LLC, TWC Communications LLC, and TWC Digital Phone LLC (collectively, "Defendants") have insisted on construing over 30 terms—13 stemming from a single patent[1], and nearly all having ordinary meaning and needing no construction.  Defendants' approach to claim construction contradicts this Court's limit of ten terms per patent.  *See Grape Tech. Group, Inc. v. Jingle Networks, Inc.*, Civ. A. No. 08-408 (GMS) (D.I. 35), n. 1 (D. Del. Oct. 20, 2009) ("Although disinclined to do so in the past, the court—regrettably—will impose a limit of 10 disputed terms per patent for claim construction in this and all future patents actions.").  AIP Acquisition, LLC ("AIP"), by contrast, believes that only five terms require construction, and seeks to give the claims their usual and ordinary meaning, as they would be understood by a person of skill in the art in view of claim context, patent specification, prosecution history, and ordinary usage in the field.

---

[1] The Defendants insist here that 13 terms from U.S. Patent No. 7,724,879 ("the '879 Patent") require construction.  In comparison, the related case, *AIP Acquisition LLC v. Level 3 Communications, LLC*, C.A. No. 12-617, involves the '879 Patent and two additional patents (U.S. Patent Nos. 6,757,275 and 7,486,662 ("the Sorrentino Patents")); there, the AIP and defendant Level 3 Communications, LLC ("Level 3") agreed that only three terms from the '879 Patent and no terms from the Sorrentino Patents needed construction.  Level 3 has since joined herein with Defendants on those three terms—"internet protocol," "signaling message," and "access device"—which are addressed in subsections 2, 3, and 4 in Section A of this brief.  For these three terms, "Defendants" will refer to all defendants, including Level 3, in the above-captioned cases.

## II.      OVERVIEW OF ASSERTED PATENTS

### A.      The '879 Patent

The '879 Patent[2] is directed to a method of communication between two access devices

via one or more networks.  A transmission is received from the first access device in a first

format (*e.g.*, analog), converted into an internet protocol format, sent through a data network,

then converted into another format (*e.g.*, cellular) suitable for the second access device.

### B.      The '579, '654, and '756 Patents

U.S. Patent Nos. 6,496,579 ("the '579 Patent")[3] and 6,078,654 ("the '654 Patent")[4] are

directed to methods and systems for efficient use of telecommunications networks.  Such

efficiency is achieved through interception of an outgoing communication by a local node which

determines, via a separate data signaling, if the call should be or could be completed.

U.S. Patent No. 6,188,756 ("the '756 Patent")[5] is directed to a method and device for

"simultaneous ring" technology, in which the availability of a called party is interrogated before

a communication from the calling party to the called party is placed.

## III.     THE LAW OF CLAIM CONSTRUCTION

Claim construction is a question of law[6] and begins with the language of the claims

because "[i]t is a bedrock principle of patent law that the claims of a patent define the invention

to which a patentee is entitled the right to exclude."  *See Phillips v. AWH Corp.*, 415 F.3d 1303,

---

[2] All exhibits cited herein appear in the Joint Appendix, which will be filed contemporaneously
with the parties' Claim Construction Answering Briefs (hereinafter "Ex. __") as Ex. 1.
[3] Ex. 3.
[4] Ex. 2.
[5] Ex. 4.
[6] *See Markman v. Westview Instrs., Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517
U.S. 370 (1996).

1312 (Fed. Cir. 2005) (*en banc*).[7]

"[C]laim terms take on their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate [therefrom] . . . by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002). "We indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning." *Id.* at 1325.

Intrinsic evidence is the most probative evidence in construing claim terms, and the Federal Circuit has "long emphasized the importance of the specification in claim construction." *Phillips*, 415 F.3d at 1315. Where the specification reveals "a special definition given to a claim term by the patentee," the "inventor's lexicography governs." *Id.* at 1316. Indeed, the specification may ascribe a special meaning to a claim term based on the scope of its description, its prevailing use, by disclaimer of some broader meaning, or by explicit definition. *See, e.g.*, *Watts v. XL Sys., Inc.*, 232 F.3d 877, 822 (Fed. Cir. 2000). Without more, however, claims generally are not limited to specific embodiments set forth in the specification. *Phillips*, 415 F.3d at 1323. "Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004). As part of the intrinsic record, the prosecution history should also be considered as "the record before the Patent and Trademark Office is often of critical significance in determining the meaning of the claims."

---

[7] "[T]he claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Extrinsic evidence should not be considered when an analysis of the intrinsic evidence alone resolves any ambiguity in a disputed claim term. *See CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1153 (Fed. Cir. 1997). If extrinsic evidence must be considered, it "may be used by the court to help understand the disputed limitation[; however] it may not be used to vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file history." *Novartis Pharm. Corp. v. Abbott Labs.*, 375 F.3d 1328, 1334 (Fed. Cir. 2004). Such evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1397 (Fed. Cir. 2008) (citation omitted); *see Phillips*, 415 F.3d at 1318, 1324.

Some claim elements are written in "means-plus-function" form pursuant to 35 U.S.C. § 112, ¶ 6. Claim elements in "means-plus-function" format are construed to cover the structures disclosed in the patent specification for performing the claimed function, and their equivalents. To construe a means-plus-function claim element, courts must: (1) identify the function to be performed; (2) determine the scope of the function using ordinary rules of claim construction; and (3) identify all structures implicitly or explicitly disclosed in the patent specification for performing the claimed function. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1330 (Fed. Cir. 2003).

Accused infringers might seek to relegate patentees to very specific and narrow structures; however, the law is clear that as long as a "class of structures [are] identifiable by a person of ordinary skill in the art," a "generic" structure can be perfectly adequate structure under Paragraph 6. *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1321-22 (Fed. Cir. 2004); *see also Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1381-82 (Fed. Cir. 2001)

(generic reference to "commercially available" "vacuum sensors" provided adequate structure because vacuum sensors were well known in the art at the time).

## IV.   DISPUTED CONSTRUCTIONS

### A.   '879 Patent

#### 1.   Preamble[8]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Preamble is not limiting. | Defendants reserve the right to pursue indefiniteness with respect to this term through a footnote in their briefing. |

The preamble of Claim 1 of the '879 Patent ("[a] method for communication between two access devices via one or more networks, comprising the steps:")[9] is not a claim limitation and need not be construed for at least three reasons.[10]  *First*, nothing in the disputed phrase serves as an antecedent basis to the claimed limitations nor is the phrase otherwise "essential to understand limitations or terms in the claim body."  *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.,* 289 F.3d 801, 808 (Fed. Cir. 2002).  *Second*, the preamble does not recite "additional structure or steps underscored as important by the specification."  *Id.*  In fact, the disputed phrase does not provide any additional structural information.  *Third*, there was no "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art."  *Id.* (noting that such reliance "indicates use of the preamble to define, in part, the claimed invention" and "transforms the preamble into a claim limitation").  The Federal Circuit has noted that preamble language merely "describing the use of an invention" or "extolling benefits or features of the claimed invention" does not function as a claim limitation.  *Id.* at 809.

---

[8] '879 Patent, Claim 1.

[9] '879 at 15:42-43.

[10] AIP addresses the preamble briefly, as Defendants who initially had proposed a construction, stated on November 14, 2013 (the evening before the Opening Claim Construction Briefs were originally due), that they now intend to address the preamble in a footnote.

These are precisely the roles played by the preamble phrase at issue here, as it serves only "to give context for what is being described in the body of the claim." *Symantec Corp. v. Computer Assocs. Int'l, Inc.,* 522 F.3d 1279, 1288 (Fed. Cir. 2008); *see also L'Oréal S.A. v. Johnson & Johnson Consumer Cos., Inc.,* CV 12-98-GMS, 2013 WL 3788803, at *1 n.2 (D. Del. July 19, 2013).  As such, AIP respectfully urges the Court to find that the preamble is not limiting, and, therefore, no construction is needed.

### 2.   "Telecommunication protocol"[11] / "Internet protocol"[12]

| '879 Patent Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- | --- |
| **Telecommunication protocol** | No construction needed. | A protocol that (1) establishes voice communication and (2) transmits voice communication for a phone call. |
| **An internet protocol** | A datagram protocol where a datagram is a self-contained, independent entity of data carrying sufficient information to be routed from the source to the destination computer without reliance on earlier exchanges between this source and destination computer and the transporting network. | One of a set of protocols used on the Internet, such as TCP/IP, used to link dissimilar computers across a variety of other networks and protocols. |

*Telecommunication Protocol.* This term is well understood by persons of ordinary skill in the art, and simply means a protocol for telecommunication, *i.e.*, transmission of communications from one point to another.  Different types of communications are contemplated by the '879 Patent.  (*See e.g.*, '879 Patent at 4:36-40 ("While phonecalls are certainly one form of communication envisioned, the invention covers any type of communication, whether it involves public service telephone networks, cellular networks, paging networks, data networks,

---

[11] '879 Patent, Claim 1.
[12] '879 Patent, Claim 1.

analog networks, etc.").)  This plain meaning would be apparent to skilled artisans at the time the patent was filed, and consistent with the industry use.  (*See*, *e.g.*, The New Institute of Electrical and Electronics Engineers ("IEEE") Standard Dictionary of Electrical and Electronics Terms (IEEE Std 100-1992) (5th ed. 1993) (Ex. 8 at 988) (defining "telecommunication" as "(1) the transmission of signals over long distance, such as by telegraph, radio, or television . . . . (2) (data transmission) The transmission of information from one point to another.").)

    In contrast to AIP's plain meaning, Defendants interpret "telecommunication protocol" to mean "a protocol that (1) establishes voice communication and (2) transmits voice communication for a phone call."  At the outset, Defendants' definition renders part of the claim superfluous, because the express language of Claim 1 already includes a "telecommunication protocol *for establishing and transmitting voice communication for a phone call* . . . ."[13] Importing this terminology into a definition of the "telecommunications protocol" itself would render the rest of that phrase redundant in the claim.

    Additionally, by defining the term through the language of Claim 1 that otherwise surrounds it, Defendants improperly narrow the definition.  Indeed, a "telecommunication protocol," as used in the '879 Patent, is not related to only voice communications.  (*See*, *e.g.*, '879 Patent, Claim 14, at 16:48-49 ("transmission is related to a fax transmission"); *see also id.* at 8:18-19 ("Voice processing entails call processing and [call] content processing"); *see also id.* at 4:41-42 ("A call is to be interpreted as any form of communication over a network and not limited just to voice phonecalls.").)  Moreover, telecommunication protocol is not only for "establishing" and "transmitting" a communication, to the exclusion of, *e.g.*, "receiving" that is contemplated by some claims.  (*See id.*, Claim 5, at 16:25. ("for transmitting and receiving").)

--------------------------------------------

[13] '879, Claim 1, at 15:46-48.

None of Defendants' citations to the intrinsic or extrinsic record supports such a restrictive

interpretation.

 *Internet Protocol.* There is no doubt that a person of ordinary skill in the art at the time

of the invention would understand that "internet protocol" as described in the '879 Patent means

a "datagram protocol."  The "internet protocol" of the '879 Patent is described by the claims and

specification as pertaining to the Internet.  Stating the obvious, the claim language refers to an

internet protocol.  The patent specification illustrates that "internet protocol" is for Internet

communications.



('879 Patent, Fig. 2)

For example, the above figure shows transmissions in the context of the '879 Patent.  In this

figure, transmissions from nodes A (50), B (52) and C (54) communicate with Internet servers

(62).  These servers are networked using "transmission control protocol/Internet protocol

TCP/IP" to route information over the Internet (56).

 The "internet protocol" of the '879 Patent includes TCP/IP.  The patent specification

unequivocally states that, "[t]he Internet network . . . us[es] internet protocols such as

transmission control protocol/Internet protocol (TCP/IP) . . . .".  (*Id*. at 7:34-37; *see also Id.* at

7:44-46 (referring to Fig. 2 above, "[t]he Internet server 62 has access to the Internet backbone

56. Both servers 60, 62 are networked using transmission control protocol/Internet protocol TCP/IP . . .".).)

The "internet protocol" of the '879 Patent **does not** include, however, different protocols such as frame relay and ATM. For example, the patent specification states that, "[t]he Internet network differs from frame relay switching and asynchronous transfer mode by using internet protocols such as transmission control protocol/Internet protocol (TCP/IP) . . . ."). (*Id.* at 7:34-37.) The patent specification's exclusion of protocols (*i.e.*, frame relay, ATM and other similar protocols) had a profound impact on the meaning of "internet protocol" within the '879 Patent. It served to disclaim prior art ATM and frame relay-like protocols from the different and distinct TCP/IP protocols that are based on datagrams.

For a person of ordinary skill in the art reading the '879 Patent, the inescapable conclusion is that "internet protocol" means "a datagram protocol." A "datagram protocol" has unique characteristics. They are illustrated by reference to well-known technical materials written around the time of the invention. For example, *Computer Networks* by Andrew S. Tanenbaum[14] states that "[c]ommunication in the Internet works as follows. The transport layer takes data streams and breaks them up into datagrams." A datagram, in turn, is "a self-contained, independent entity carrying sufficient information to be routed from the source to the destination computer without reliance on earlier exchanges between this source and destination computer and the transporting network." (RFC 1594 (Network Working Group 1994) (Ex. 10 at 33)*; see also* RFC 791 (Internet Protocol, DARPA Internet Program Protocol Specification, 1981) (Ex. 11 at 2) ("The internet protocol treats each internet datagram as an independent entity unrelated to any other internet datagram. There are no connections or logical circuits (virtual or

---

[14] Andrew S. Tanenbaum, Computer Networks (4th ed. 1996) (Ex. 9 at 413).

otherwise).”); RFC 793 (Transmission Control Protocol, DARPA Internet Program Protocol Specification, 1981) (Ex. 12 at 2) (“The TCP fits into a layered protocol architecture just above a basic Internet Protocol which provides a way for the TCP to send and receive variable-length segments of information enclosed in internet datagram ‘envelopes’. The internet datagram provides a means for addressing source and destination TCPs in different networks. The internet protocol also deals with any fragmentation or reassembly of the TCP segments required to achieve transport and delivery through multiple networks and interconnecting gateways.”) (internal citations omitted).) One of ordinary skill of the art would recognize the Internet Engineering Task Force (IETF) Request For Comments (RFC) definition to represent “the accepted meaning[] of terms used in [the relevant] fields of science and technology.” *Phillips*, 415 F.3d at 1318.

Defining an internet protocol as a datagram protocol is also consistent with the ’879 Patent specification: TCP/IP is an example of a datagram protocol, while ATM and frame relay protocols are not. *See*, *e.g.*, RFC 1594 (Ex. 10 at 1) (confirming that TCP/IP is “a datagram protocol.”); *see also* Tanenbaum ( Ex. 9 at 60, 450) (describing ATM and frame relay as being virtual circuit protocols and not datagram protocols)[15]; R.J. Cherukuri and J.H. Derby, *Frame Relay: Protocols and Private Network Applications* (1989) (Ex. 13 at 678, col. 2 to 681, col. 1)

---

[15] A virtual circuit protocol is not a datagram protocol because a virtual circuit protocol transmits data packets that are not datagrams. *See*, *e.g.*, Tanenbaum (Ex. 9 at 452-455) (disclosing that the source host computer, the destination host computer, and the transporting ATM network (*e.g.*, ATM switches in the network) establish a virtual circuit; because the ATM packets rely on earlier exchanges between the source computer, the destination computer, and the transporting network in order to be communicated from the source to the destination computer, ATM packets are not datagrams, and, as a consequence, an ATM protocol, which is a protocol for communicating ATM cells, is not a datagram protocol).

(disclosing that the source host computer, the destination host computer, and the transporting frame relay network similarly establish a virtual circuit).[16]

Defendants' proposed construction is unreasonably broad:  it encompasses both ATM and frame relay protocols, in direct contravention of the '879 Patent specification.  *See  Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1372 (Fed. Cir. 2004) (plain meaning interpretation not used when inconsistent with the patent specification).  For the reasons noted above, the term "internet protocol" would have been understood by one skilled in the art to be "a datagram protocol."

   3.   **"Signaling message"[17]**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Control information exchanged between two points in a network to establish, maintain and/or remove a phone call as distinguished from conversation information exchanged between a caller and a call recipient over an already established phone call. | information related to the establishment and control of a connection to facilitate telecommunications. |

AIP proposes that "signaling messages" should be construed as "control information exchanged between two points in a network to establish, maintain and remove a phone call, as distinguished from conversation information exchanged between a caller and a call recipient over an already established phone call."  This proposal is consistent with the '879 Patent intrinsic record and is supported by extrinsic evidence.

---

[16] It should be noted that the USPTO has determined in the past that "an ATM network [is] not by itself an Internet protocol."  Reexamination of U.S. Patent No. 6,243,373 ("the '373 Patent"), Final 1/4/2011 Office Action, at 12 (Ex. 14 at AIP00005962) (where, similar to the '879 Patent, the examiner explained, "The specification of the '373 Patent under reexamination describes Internet communications as including conventional protocols, such as transmission control protocol (TCP), user datagram protocol (UDP) and the internet protocol (IP). . . . TCP/IP and UDP/IP have become worldwide *de facto* standards for interprocess communication and provide the underlying transport mechanism in use on the Internet.")  (internal quotations omitted).
[17] '879 Patent, Claim 15.

Indeed, "signaling messages" of dependent Claim 15 of the '879 Patent are encompassed in the term "transmission" of corresponding independent Claim 1,[18] which, in turn, requires the claimed "transmission" (and, thus, signaling messages) to be in a format that comprises a telecommunication protocol "for establishing and transmitting voice communication for a phone call . . . ."[19] Hence, signaling messages are related to control of a phone call connection, and may be used to establish, maintain, or remove, a phone call. The specification supports this understanding. Col. 2, lines 4-12 of the '879 Patent specification states that "control information in the form of an inquiry of the availability status of the party to be called may be sent through different networks by routing it through a control location of the inventive system that converts it into compatible form." The '879 Patent specification also includes various examples of signaling messages, such as the call supervision signal 38, the uncompleted call signal 42, and the reverse answer supervision signal 47 shown and described relative to Fig. 1.

"Signaling messages" further exclude "conversation information" (exchanged between a caller and a call recipient over an already established phone call). (*See*, *e.g.*, Telecom:  TNA 102 (June 1996) (Ex. 15 at 5, Section 3) (defining "signaling" as "the exchange of information (**other than by speech**) which is specifically concerned with the establishment, release and other control of calls over the PSTN").)[20] This distinction is well-understood by people of ordinary skill in the art.[21]

---

[18] *Id.*, Claim 15, at 16:50-51 ("wherein the transmission comprises signaling messages").

[19] *Id.*, Claim 1, at 15:47-48.

[20] *See also* M.L. Gurrie and P.J. O'Connor, *Voice/Data Telecommunications Systems, An Introduction to Technology* (1986) (Ex.16 at 222) (stating that "**[a]s distinguished from voice or digital information**, signaling conveys facts such as where the information is to be sent, when it is to be sent, and who is going to pay for the use of services and equipment"; U.S. Patent No. 3,306,984 at 1:17-20 (Ex. 17) (stating that "[s]ignaling, in telephone parlance, refers to the transmission of control information **ancillary to the voice-frequency message waves** which it is the primary purpose of a telephone system to transmit"; Bijan Jabbari, Common Channel

Defendants' construction is overly broad, encompassing *all* "information related to the establishment and control of a connection to facilitate telecommunications."  It places no qualification on the type of network connection that is established, maintained, and removed, and appears to encompass *any* information exchanged at *any* layer of a protocol stack in *any* type of networking context.  As discussed above, the signaling messages, which are included in the transmission, are specifically related to control of a *phone call* connection, not merely control of any connection in a network.  Because Defendants' proposal fails to limit the scope of a "signaling message" to phone call connections, it is inconsistent with the '879 Patent specification and, therefore, does not properly reflect a reasonable interpretation of a "signaling message."

### 4.   "Access device"[22] / "First access device"[23] / "Second access device"[24]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| A device to access a communications network. | End-user device that is the ultimate initiator or ultimate destination of the transmission. |

---

Signaling System Number 7 for ISDN and Intelligent Networks, *Proceedings of the IEEE* (1991), Vol. 79, No. 2 (Ex. 18 at 155, col. 2, lines 5-6, and 156, col. 1, lines 10-13) (acknowledging the distinction between signaling and conversation).
[21] J.A. Pecar et al., *The McGraw-Hill Telecommunications Factbook* (1993) (Ex. 19 at Fig. 5.2) (showing that the signaling of a phone call connection does not include the conversation information exchanged between the parties of the phone call after the call is connected); E. Bryan Carne, *Telecommunications Primer:  Signals, Building Blocks and Networks*, Prentice-Hall PTR (1995) (Ex. 20 at 293) (identifying "associated signaling" as occurring "when signaling messages are sent over the same route (transmission and switching facilities) as the information that is exchanged between the parties" and identifying "disassociated signaling" as occurring "when signaling messages are sent over a route different from the route taken by the information that is exchanged between the parties," thereby distinguishing signaling messages (associated or disassociated), which are used by the telephone network over which the call is established to control the call, from conversation information, *i.e.*, the information that is exchanged between the parties of the call).
[22] '879 Patent, Claims 1 and 3.
[23] '879 Patent, Claims 1 and 3.
[24] '879 Patent, Claims 1 and 3.

For these terms, AIP proposes that only an "access device" need be construed, and that its proper construction is "a device to access a communications network."[25]  AIP's definition is consistent with the plain and ordinary meaning of the term, and is supported by the specification of the '879 Patent.  For example, Figures 7A-7G explicitly show access devices on a network.  *See also Id.* at 11:45-54 ("FIGS. 7A-7G exemplify different techniques for efficient routing communications in accordance with the invention.  Access devices . . . on a network are shown . . .").  The '879 Patent specification also identifies numerous examples of access devices: "[a]ccess devices are exemplified by telephones, pagers, cellular phones, laptops, facsimile machines, multimedia computer workstations, etc." (*Id.*at 13:22-24; *see also id.* at 9:42-46 (establishing that "a telecopier, telex, voice telephone, cellular phone, radio phone, data entry terminal, etc." are all "different types of communication access devices").)  Thus, AIP's proposed construction is amply supported by the intrinsic evidence.

Defendants, by contrast, improperly seek to limit the term by defining the access devices as (a) the "ultimate" initiators or destinations, and (b) "end-user devices."  Yet, neither limitation is present in the asserted claims of the '879 Patent.  The '879 Patent further clarifies that the "ultimate" initiators are "calling parties" (not access devices), (*see id.* at 4:50-51 ("As used in this application, the term 'calling party' designates the *initiator* of the transmission or communication . . ." (emphasis added)), and that the access devices may, but need not, be end-user devices.  (*See, e.g., id.*, Claims 3 and 5 (indicating that a calling party and called party (with their end-user equipment) are "connected" to the respective access devices); *see also* U.S. Patent Application No. 08/320,269, Application for Letters Patent, at 11 (Ex. 5 at AIPC00003918), *and*

---

[25] AIP's view is that the words "first" and "second" in the latter terms need not be construed.

at 13 (Ex. 5 at AIPC00003920)[26] (describing how private automatic branch exchanges (PABX)

(telephone switching systems in *e.g.*, hotels) are capable of initiating phone calls, and how nodes

interface therewith at user locations).)  The term "access device" is plain, and nothing in the

intrinsic record *mandates* that this term be limited in the manner Defendants propose.

*N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1290-91 (Fed. Cir. 2000) ("This court

has repeatedly and clearly held that it will not read unstated limitations into claim language.").

### 5.      "A further format suitable for the second access device"[27]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction needed.  (Other than "access device," above.) | A further format for the transmission that can be received and used by the second access device. |

No construction is necessary for this term, other than a construction of "access device,"

provided in Section A.4 immediately above.[28]  Defendants appear to agree, at least with respect

to "a further format," since they re-use those words in their definition.  Defendants, however,

improperly seek to add the limitation that this format is "for the transmission that can be received

and used by the second access device," presumably as a substitute for "suitable for."  But there is

no basis for this limitation in the intrinsic record.

Even the sections of the specification cited by Defendants never mention the added

limitations of "can be received and used" (after that conversion)  and those same sections suggest

that converted transmissions further travel through a public switched telecommunications

---

[26] Included as part of the file history for U.S. Patent No. 5,710,809 ("'809 Patent") (Ex. 5).

[27] '879 Patent, Claim 1.

[28] "We indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning."  *Teleflex*, 299 F.3d at 1325.

network before reaching a second access device.[29]  Consequently, it is improper to read these

extraneous limitations into the claim, as the patentee did not demonstrate an intention to limit the

term in that manner.  "[T]he claims of the patent will not be read restrictively unless the patentee

has demonstrated a clear intention to limit the claim scope using 'words or expressions of

manifest exclusion or restriction.'"  *Liebel-Flarsheim*, 358 F.3d at 906.

### 6. "Receiving a transmission in a first format through a first communication network from a first access device"[30]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction needed. | Receiving a transmission in a first format that originated from a first access device, entered a first communication network and passed out the other side of that first communication network. |

Once again, Defendants offer an unnecessary definition where the term is clear (with the

additional definition for "access device" provided above), and no construction is necessary

beyond the term's self-evident plain and ordinary meaning.  Indeed, the receiving step of the

claim at issue, '879 Patent at 15:44-45, focuses on what is being *received* (a transmission from a

first access device and in a first format), and how it is *received*  (through a first communication

network).  By focusing on "receiving," this step does not mandate how the transmission is *sent*

from the access device, *i.e.*, it does not define a complete connection between an access device

and the equipment (or their parts) that perform the second step of the claim.  (*See, e.g., id.* at

14:30-33 (showing a possible choice for a transmission path: "For instance, one route. . . may be

from the calling party access device 12 to the local access node 18 *either directly or through the*

*intercept* 16 . . .") (emphasis added); *id.* at 2:22-26 (showing that the intercept may convert a

---

[29] *See, e.g.*, '879 Patent at 4:61-5:7; *Id.* at 12:4-9  (Illustrating how a communication may be further converted *for* [*further*] *transmission over, e.g.*, a public switched communications network).

[30] *Id.*, Claim 1.

transmission from the access device and send it through different networks: "The inventive system may have external or internal software and hardware that intercepts the normal transmission to route it appropriately.  The system effects further routing, which *may include converting between different forms of communication networks. . ."); *see also* Fig. 8 (showing a choice of networks that can route the transmissions from intercepts to the central local node A, which choice may differ from the network connection between the access device and the intercept; furthermore, these choices (within the "subscriber access device interface" element in Fig. 8) are only illustratively separated as "analog *and* digital," "cellular *and* paging," etc. (emphasis added), and still acknowledge multiple, not single, networks in the transmission's chosen route from the intercept).)  All that the "receiving" step is concerned with is the receiving, (through a network), so that the next step (conversion) could be performed.

Based on this fundamental misconception, Defendants impose limitations not present in the claim language.  Defendants reuse most of the same plain words ("receiving a transmission in a first format . . . from a first access device"), but they further restrict the definition by (a) requiring a transmission to "originate" from a first access device, (b) requiring effectively the access device to be immediately connected to the first communication network ("entered" a first communication  network), and (c) ending that network before the equipment (or their parts) that performs the second step of the claim ("passed out the other side. . .").  All of these limitations are missing from the claim language, and are improper.  For example, the access device may, but need not, "originate" the transmission, since a first access device could be something other than an end-user device (associated with the calling party that originates the call), *see*, *e.g.*, U.S. Patent Application No. 08/320,269, Application for Letters Patent, at 11 (at AIPC00003918),

*and* at 13 (at AIPC00003920)[31] in Section A.4, *supra* (showing that an exemplary access device PABX that connects to hotel-room telephones from which calls are originated).  Similarly, nothing in the claims, specification, or prosecution history cited by Defendants provides any support for the limitation that requires the first communication network to extend all the way to the access device, or to end prior to the conversion step.  Indeed, access devices may be separate from the intercepts and, thus, the connection therebetween may be different than the connection between the intercept and the central local node A in Fig. 8.  (*See, e.g.*, Figs. 1 and 9 (showing an intercept 16 separate from the access device 12).)  Moreover, access devices and a path therebetween may all be on one network, *see, e.g.*, '879 Patent at 11:47-49 ("Access devices 150 and 156 (FIGS. 7A-7G) and nodes 152 (FIGS. 7A-7C, 7E-7F), 154 (FIGS. 7A-7G) and 160 (FIG. 7C) *on a network* are shown . . .") (emphasis added).  Therefore, the term should not be restricted to the definition they propose.  *Renishaw,* 158 F.3d at 1248-1249, *citing McCarty v. Lehigh Val R.R.,* 160 U.S. 110, 116, 16 S.Ct. 240 (1895) ("[W]e know of no principle of law which would authorize us to read into a claim an element which is not present . . . .  The difficulty is that if we once begin to include elements not mentioned in the claim in order to limit such claim . . . , we should never know where to stop.").

7.      **"First communication network,"[32] "Analog telephone network"[33] and "Digital telephone network"[34]**

| '879 Patent Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **First communication network** | No construction needed. | A single network with a plurality of telephones that use a telecommunications protocol to communicate with each other. |

---

[31] Included as part of the file history for U.S. Patent No. 5,710,809 ("'809 Patent") (Ex. 5).
[32] '879 Patent, Claims 1 and 4.
[33] *Id.*, Claims 1 and 4.
[34] *Id.*, Claims 1 and 4.

| '879 Patent Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **Analog telephone network** | No construction needed. | A single all-analog network with a plurality of telephones that use a telecommunications protocol to communicate with each other. |
| **Digital telephone network** | No construction needed. | A single all-digital network with a plurality of telephones that use a telecommunications protocol to communicate with each other. |

First Communication Network.  As explained immediately above in the "receiving"

section (A.6, *supra*), the claim at issue is concerned with "receiving" a transmission, not how it

is "sent."  Hence, a "first communication network" is plainly the communication network from

which the transmission is received.  This is also supported by the specification.  *See id.* at 13:17-

27 (showing how a central local node may be accessed by "communication networks such as

digital and analog telephone, paging and cellular, and data.").

Building on their misconception identified in the preceding "receiving" section,

Defendants impose limitations not present in the claim language.  *First*, Defendants mandate a

"single" network between the access device and the equipment that performs the second step of

the claim at issue, thereby attempting to exclude non-single networks, *e.g.*, a combination of

different networks (of the same or different type) located between a calling access device and

equipment (or their parts) that receive the transmission prior to the second step of the claim.

However, in addition to the arguments laid out in the "receiving" section above (that show an

intercept separate from the access device and capable of routing the transmission through a

choice of networks to the local node), the '879 Patent specification also separately implicitly

recognizes that telecommunication networks may employ "a combination of networks" (*Id.* at

1:57), and that those networks may be of different types.  (*See id.* at 2:22-27.)  *Second*, while

Defendants also argue that the network must include "a plurality of telephones," such telephones are not explicitly claimed, and the specification clearly supports other devices,[35] *e.g.*, facsimile machines,[36] etc. *Third*, Defendants' further limitation that requires the telephones to use "a protocol to communicate with each other" is misplaced, because the same network can include different devices (*e.g.*, telephones and fax machines), or different varieties of the same device (e.g., rotary telephones and DTMF telephones) that might not be able to "communicate" with each other via a particular protocol.

Analog Telephone Networks and Digital Telephone Networks. Since Defendants re-use most of the words from the "first telecommunication network" above, and the only meaningful difference is the respective addition of the terms "all analog" and "all digital," AIP incorporates all arguments identified above, as if fully set forth herein. Furthermore, the "all" (analog or digital) importation is misplaced, in light of the devices that interconnect different networks and may have non-analog or non-digital components. (*See, e.g., id.* at 4:64-66, showing nodes that interconnect different networks: ("At the first central local node 18, the call from the calling location 12 is converted to a data signal which is then sent over a data network").)

8. **"Sending the converted transmission . . . for reception by a second access device"[37]**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction needed. | Sending the transmission in the second format . . . so that the transmission in the |

---

[35] *See, e.g., id.* at 4:36-42 ("While phonecalls are certainly one form of communication envisioned, the invention covers any type of communication, whether it involves public service telephone networks, cellular networks, paging networks, *data networks*, analog networks, etc. A call is to be interpreted as *any form of communication over a network and not limited just to voice phonecalls*.") (emphasis added).

[36] *Id.* at 6:40-42 ("Users may . . . send faxes to remote locations. . ."). *See also id.* at 9:41-43 ("The network access devices . . . could be a telecopier, telex, voice telephone, cellular phone, radio phone, data entry terminal, etc.").

[37] *Id.*, Claim 1.

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
|  | second format can be received and used by the second access device. |

Rather than focus on plain and ordinary meaning of these words, Defendants again offer

an unnecessary construction.  Here, the dispute centers on Defendants' attempt to construe "for

reception by a second access device" to mean "so that the transmission in the second format *can

be received and used by* the second access device."  This limitation implies that the second

access device can receive and use the transmission *in an internet protocol* (second format).  The

plain language of Claim 1, however, states that that the transmission in the second format is

*further converted* "from the second format to a further format. . ."  (*See also id.* at 4:64-5:7

("Prior to reaching the called party, the [internet protocol] data signal is reconverted into

voice . . . to be transmitted to the destination 14 via a public communications network or other

connection line . . . All internode connections are via the data network.").)

Consequently, Defendants' proposed limitation erroneously excludes explicitly disclosed

embodiments, *e.g.*, where the transmissions are received in protocols other than the internet

protocol (*id.* at 4:64-5:7).  As such, it should be rejected.  *In re Katz Interactive Call Processing

Patent Litig.*, 639 F.3d 1303, 1324 (Fed. Cir. 2011) ("[T]here is a strong presumption against a

claim construction that excludes a disclosed embodiment . . .").

### 9.    "Telecommunication nodes"[38]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction needed. | Components that intercept the phone call from a communications network and reroute it from its intended path to an alternate path. |

---

[38] *Id.*, Claim 1.

"Telecommunication nodes" have a plain and ordinary meaning of being a connection point or endpoint on a telecommunication system.[39]   However, Defendants still propose a convoluted definition in which the "telecommunication nodes" are "components that intercept the phone call from a communications network and reroute it from its intended path to an alternate path."   This limitation is wrong for several reasons.

*First*, Defendants' construction imports an "intercept" limitation from a single embodiment of the specification, to the exclusion of other embodiments.[40]   These other embodiments contemplate instances in which the function of an "intercept" is described separately from a "node,"[41] and instances where references to "nodes" make no mention of an intercept whatsoever.[42]   Hence, while the concept of intercepting a transmission is contemplated by the '879 Patent, it is not required.   It is improper to narrow this claim term to support only one interpretation when the specification clearly supports a broader meaning.   *See Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1301 (Fed. Cir. 1999) ("It is well established that the

---

[39] *Id.*, Figs. 7A – 7C, 12:4-8 ("Nodes 152 and 154 convert voice transmissions into data transmission and vice versa so that data transmissions travel between nodes 152 and 154 and voice transmissions travel from the access devices to the associated nodes 152, 154"); *Id.* at 12:21-24 ("FIG. 7C is the same as that of FIG. 7A, except that an additional node 160 between nodes 152, 154 is shown to illustrate that the routing between nodes 152, 154 may not be direct . . ."); *Id.* at 11:53-54 ("Node 158 (FIG. 7B) represents an access device on a different network.").

[40] Defendants' construction presumably hinges upon the disclosure of a "transparent telecommunications node or intercept" in the specification.  *Id.* at 4:23-24.

[41] *See id.* at 9:27-29 ("The normal transmission from an access device is intercepted by an intercept device, which routes the transmission to a central local node."); *see also Id.*at 13:19-22 ("Access devices may communicate with central local nodes directly or through intercept devices which direct the communication to the central local node."); *Id.* at 13:63-66 ("In so doing, other central local nodes B or C may be used for part of the routing or else route directly to the access devices via the associated intercept *if any* for the access device.") (emphasis added).

[42] *See id.* at 11:53-54 ("Node 158 (FIG. 7B) represents an access device on a different network."); *id.* at 12:21-24 ("FIG. 7C is the same as that of FIG. 7A, except that an additional node 160 between nodes 152, 154 is shown to illustrate that the routing between nodes 152, 154 may not be direct.").

preferred embodiment does not limit broader claims that are supported by the written description.").

*Second*, Defendants' definition incorrectly asserts that a telecommunication node must "reroute" a phone call "from its intended path to an alternate path," which has no support in the claims or the specification.  Rather than requiring that a predetermined "intended path" must be overruled by a new routing decision, the patent contemplates that a path may be selected by a central local node *after* receiving a transmission from *e.g.*, an intercept.[43]  Hence, it is apparent that no intended path existed prior to the intercept receiving the transmission, and hence there would be no decision to "reroute" the transmission to an "alternate path."

### B.    '654, '579, and '756 Patents

   1.    **"In a manner transparent to a/the calling party and a/the called party"[44] / "In a manner transparent to the calling party telephone user equipment and the called party telephone user equipment"[45] / "In a manner transparent to the users of the calling party access number and the called party access number."[4647]**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Transparent is pertaining to a device or system that processes data without the user being aware of or needing to understand its operation.  Otherwise, no construction needed. | Without user input during the call, or user awareness of the system handling the call or the stages of the connection process. |

AIP's proposed definition of the term "transparent" comes directly from that proffered by the Patentee during the prosecution of the '654 and '579 Patents:

---

[43] The transmission is then "routed based on the results from an evaluation of all available communication networks."  *Id.* at 1:66-2:1.

[44] '654 Patent, Claim 1; '579 Patent, Claims 1 and 5.

[45] '654 Patent, Claim 5.

[46] '756 Patent, Claim 8.

[47] AIP contends that only the term "transparent" requires construction, and no construction is necessary for the other elements of the terms grouped above other than their plain and ordinary meaning.

> As used in the art, the term "transparent" means "pertaining to a
> device or system that processes data without the user being aware
> of or needing to understand its operation."  See e.g., McGraw-Hill
> Dictionary of Scientific and Technical Term (4th ed. 1989).

'654 patent file history, 10/29/1998 Response to Office Action, at 3 (Ex. 6, at AIPC00001158).

The same statement was also reiterated in the prosecution history of the '579 Patent.[48]  Hence,

the Patentee explained the meaning of a claim term in the course of dealings with the Patent

Office, thereby rounding out the record.  *Vitronics*, 90 F.3d at 1582 (the prosecution history

rounds out a record on which the public is entitled to rely).[49]  Nowhere in the prosecution history

has the Patentee provided or even suggested a different definition from the one quoted above.

Defendants contradict the intrinsic record by inexplicably adding two narrow and

ambiguous limitations with respect to the term "without," and further reading out one

unequivocally stated limitation.  Defendants' first added "without" limitation ("without user

input during the call") improperly narrows the term's definition and contradicts the intrinsic

record, which clearly contemplates user input, *e.g.*, called party answering, calling party hanging

up, etc.,[50] for determining whether to connect the call.  Defendants' second added "without"

limitation ("without user awareness of the system handling the call or the stages of the

connection process") is irreparably ambiguous.  On the one hand, their construction might

require no user awareness of (a) "the system handling the call" or (b) "the stages of the

---

[48] '579 patent file history, 3/15/2002 Response to Office Action, at 3 (Ex. 7 at AIPC00003137).

[49] The Federal Circuit has instructed the courts to "consider the patent's prosecution history"
"[in] addition to consulting the specification," *Phillips*, 415 F.3d at 1317.

[50] '579 Patent at 7:21-25; '654 Patent at 7:16-20 ("In the event that called party 14 answers the
call originated from switch 22, it may employ channel 20 to advise node 16 that an answer has
occurred, as is indicated in block 68 or, alternatively, may go directly to block 70 and, thereby,
make a direct connection from switch 22 to local node 16. . ."); '579 Patent at 5:58-60; '654
Patent at 5:53-55 ("After call termination, node 16 will generate a reverse answer supervision
signal 47 to advise unit 22 that calling location 12 has hang-up. This terminates the billing
process."). A person of ordinary skill in the art would immediately understand that the hang-up
also could occur during the call-setup.

connection process," and, on the other hand, it might require no user awareness of "the system handling the call or [the system handling] the stages of the connection process."  This proposed limitation only adds confusion, rather than serve to clarify the term "transparent."

Finally, Defendants also read out a limitation ("without *needing to understand* [the device/system's] *operation*" (emphasis added)), which was unequivocally stated during the prosecution.  Reading out the expressly stated limitations from the definition is improper.  "'[I]f the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history,' then that definition governs." *Advanced Fiber Technologies Trust v. J & L Fiber Services, Inc.*, 674 F.3d 1365, 1374 (Fed. Cir. 2012), citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002).

Because AIP's proposed definition mirrors the exact language used during prosecution, and because Defendants' interpretation is both too narrow and ambiguous, AIP's construction of "transparent" should be adopted.

2.    **"Calling telephone equipment"[51] / "Calling (party) telephone user equipment"[52]**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction needed | Calling telephone. |

The terms "calling telephone equipment/calling party telephone user equipment" are plain and ordinary, and require no construction.  The specification supports the interpretation that various types of equipment can be used, *e.g.*, telephones,[53] fax equipment,[54] private automatic branch exchange (PABX) equipment,[55] etc.

---

[51] '579 Patent, Claims 1 and 5; '654 Patent, Claim 5.
[52] '654 Patent, Claim 5.
[53] *See* '579 Patent at 3:48-52; '654 Patent at 3:44-48 ("reverse direction telephone calling to areas").

Defendants improperly seek to limit these terms to only a "telephone" and cite to the

prosecution history for their support,[56] referencing in particular Moll, U.S. Patent No. 5,027,387

("the '387 Patent"), which uses the term "telephone."  However, the "telephone" of Moll itself

contemplates different types of telephone equipment, *e.g.*, "ISDN, TWX, TELEX, teletype,

video, and other terminals."  (Ex. 21 at 3:59-60; *see also* '879 Patent at 13:22-24.)[57]

Additionally, it should be noted that, on the same page of the prosecution history cited by

Defendants,[58] the Patentee, when referring to his invention, used the term "telephone

equipment," not "telephone," thereby indicating a broader meaning.

### 3.     "Calling location"[59]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction needed | Calling telephone. |

"Calling location" is another ordinary term that requires no construction.  *See, e.g.*, '579

Patent at 5:1; '654 Patent at 4:63 ("a phonecall 26 originating from caller location 12").[60]

Defendants propose to construe this term as a calling telephone, the same as "calling telephone

equipment" above, which is improper under the doctrine of claim differentiation.  *CAE*

*Screenplates Inc. v. Heinrich Fiedler GmbH*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("[T]he use

---

[54] *See* '579 Patent at 4:5-10; '654 Patent at 3:66-4:5 ("a telecommunications network which may, without limitation, . . . comprise any of a number of private voice/fax telecommunications network." (thereby indicating that fax equipment might be used)).

[55] '579 Patent at 4:20-21; '654 Patent at 4:15-16 ("Node 16 is interfacable [*sic*]with a PABX at the user location.").

[56] '579 Patent file history, 3/15/2002 Response to Office Action, at 4 (Ex.7 at AIPC0003138).

[57] It should be noted that Moll is also referenced in the specification of the '579 and '654 Patents, at 1:64-65, and 1:63-64, respectively.  Consequently, the devices listed in Moll should be considered as incorporated by reference into the specification of the '579 and '654 Patents.

[58] *See* footnote 56 *supra*.

[59] '579 Patent, Claims 1 and 5; '654 Patent, Claim 1.

[60] *See also* '654 Patent at 6:20-23; '579 Patent at 6:25-28 ("a calling location in a first foreign country wishes to place a call to the called location 14 in a second foreign country."); '654 Patent at 6:7-9, '579 Patent at 6:12-14 ("where called location 14 *is a foreign country* or is in an earlier (more westerly) time zone than [calling] location 12") (emphasis added).

of . . . different terms in the claims connotes different meanings"). Had the Patentee intended the same meaning, he would have used the same term when drafting the claims.

Indeed, the intrinsic record clearly distinguishes the "telephone equipment" from a "location." (*See, e.g.*, footnote 55 *supra*, citing '579 Patent at 4:20-21; '654 Patent at 4:15-16 ("Node 16 is interfacable [*sic*]with a *PABX* [telephone equipment] *at the user location*.") (emphasis added).) Moreover, multiple pieces of telephone equipment may be present at a single location, thus further delineating the difference—the intrinsic record specifies that calls originate and terminate at "locations" with assigned telephone numbers,[61] and each such location (*e.g.*, a hotel) may have multiple telephone equipment pieces associated with the assigned telephone number.

> **4.    "Transmitting to a control location identification for the calling telephone equipment and the called telephone equipment"[62] / "Means for transmitting to a control location identification for the calling telephone equipment and the called telephone equipment"[63]**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction needed<br><br>Structure is transparent telecommunications node 16 (intercept) and structural equivalents | Transmitting identification information for the calling telephone and the called telephone to a control location over a network independent from the telecommunications network over which the voice communication travels.<br><br>Structure: transparent telecommunications node 16 (intercept) and structural equivalents<br><br>Function: Transmitting identification information for the calling telephone and the called telephone to a control location over a |

---

[61] '579 Patent at 4:63-5:4; '654 Patent at 4:58-66 ("[T]he instant method entails the assignment by node 16 of a caller identification number to calling location 12. Similarly, there is assigned a called party identification number (typically the called telephone number) for the called location 14. Thereby, a phonecall 26 originating from caller location 12 is acquired at local node 16 which stores data corresponding to the caller identification number and the called party identification number.").

[62] '579 Patent, Claim 1.

[63] *Id.*, Claim 5.

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| | network independent from the telecommunications network over which the voice communication travels |

No construction is needed for these phrases, as their plain and ordinary meaning is clearly expressed in the specification.[64]  Defendants seem to agree, and reuse the same words from the term in their construction, but then add two notable limitations.  At the outset, Defendants continue to restrict "telephone equipment" to "telephones," an argument that fails for all the reasons stated in Section B.2 regarding the term "calling telephone equipment," which are fully incorporated herein.

Additionally, Defendants add a 14-word limitation "over a network independent of the telecommunications network over which the voice communication travels," which is conspicuously absent from the claim itself.  *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (citations omitted) ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves . . .").  When the Patentee intended to limit the claims to a network independent from the voice network, he expressly did so.  (*See*, *e.g.*, Claim 1 in U.S. Patent Application No. 08/320,269 (filed on 10/11/1994) (parent application to the patent at issue), '809 file history, Application for Letters Patent, at 22-23, Ex. 5, at AIPC00003929-3930).)  Hence, this 14-word phrase is, simply put, an improperly imported limitation.  *Superguide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870,

---

[64] *See* '579 Patent at 5:24-26; '654 Patent at 5:19-21 ("The requisite calling and called party identification information is then provided over link 34 to said central switching unit . . . ."). *See also* '579 Patent at 6:64-67; '654 Patent at 6:59-62; '654 Patent at 6:25-26; '579 Patent at 6:30-31 ("call 50 is made to local node 16 which call includes caller, destination and security codes."); '654 Patent at 6:55-57; '579 Patent at 6:60-62 ("node 16 will then proceed to acquire the destination number, that is, the called party identification number for the called location"); '654 Patent at 6:59-61; '579 Patent at 6:64-66 ("Therefrom said signal 28 (see FIG. 1), containing the calling and called party identification numbers will be communicated,. . .").

875 (Fed. Cir. 2004) ("[t]hough understanding the claim language may be aided by the explanations contained in the written description, it is important not to import into a claim limitations that are not part of the claim."); *Liebel-Flarsheim*, 358 F.3d at 906 (claims at issue should not be read as limited to an embodiment from the specification where the Patentee has not "demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'").

Defendants propose a structure of transparent telecommunications node 16 (intercept) and structural equivalents as the means for performing the proposed function which was addressed above.  AIP agrees with Defendants as to this structure, but asserts the above arguments against Defendants' proposed function.

5. **"Determining whether a call from the calling location to the called party access number should be connected via the telecommunication network"[65] / "Means for determining whether a call from the calling location to the called party access number should be connected via the telecommunication network"[66]**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction needed<br><br>Structure: a local node 16 and central switching unit 22 | Confirming a connection between the control location and the called party prior to connecting the calling party.<br><br>Structure: central switching unit switch 22<br><br>Function: confirming a connection between the control location and the called party prior to performing callback to the calling party |

No part of this term requires construction.  The specification makes clear that this determining step may include several parts.  For example, Figure 2, and the corresponding description of the preferred embodiment ('579 Patent at 6:51-7:33), describe the initial

---

[65] '579 Patent, Claim 1.
[66] '579 Patent, Claim 5.

determination (by switch 22) whether or not to accept the call from the calling location (step 60) for connection with the called party (and if not, local node 16 would route the call through a local PTT or another network, or even terminate a call). (*Id.*) Then, in step 62, switch 22 (after accepting the call from the calling location) may initiate a call to the called party access number and monitor for an answer, and then connect the call with the calling party via callback. (*Id.*) Also, "callback" is not mandated in the claims where this term appears (it is explicitly identified in other dependent claims). Defendants limit the terms to require the determination to occur "prior to connecting the calling party," which is improper for at least two reasons. *First*, "callback" is only claimed in a few unrelated claims,[67] whereas the claims at issue, and a number of other similar claims, are not limited to a callback.[68] *Phillips*, 415 F.3d at 1314 ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term."). *Second*, even when callbacks are indeed initiated, the "determination" may occur simultaneously therewith, or subsequent thereto. (*See, e.g.*, '654 Patent at 7:32-40; '579 Patent at 7:38-46 (central switching unit originates calls to the calling and called locations simultaneously and keeps the called location on hold during the determination process).)

Defendants' definition improperly focuses solely on the callback, and advances an improperly narrow limitation that the connection be "confirmed" between a control location and the called party "prior to connecting the calling party." "Confirming a connection" is narrower than the actual term ("determining whether a call. . . should be connected") because it focuses only on the calls that are both accepted by the control location and answered by the called

---

[67] *See* '579 Patent, Claim 4 ("in response to the status signal"); '654 Patent, Claim 2.
[68] *See* '579 Patent, Claims 1 and 5; '654 Patent, Claim 1 (claims at issue); *see also* '579 Patent, Claims 6 and 10 ("selecting a transmission path").

location, and disregards, for example, (a) the calls not accepted by the control location, and (b) "no-connection" (*e.g.*, "busy" signal or "no answer) calls."[69]   Moreover, the inexplicable addition of the limitation "prior to connecting" disregards, and renders superfluous, the express language of the claim:  Claims 1 and 5 of the '579 Patent expressly state, in their respective "connecting" step and means elements, that the call is connected "from the calling party access number to the called party access number via the telecommunication network, *when the step of determining results in a determination that the call should be connected via the telecommunication network*" (emphasis added).  *Liebel-Flarsheim*, 358 F.3d at 910 (explaining that when the plain language of asserted and unasserted claims is different, it triggers the doctrine of claim differentiation).

Defendants propose a structure of central switching unit 22 as the means for performing the proposed function.  However, both local node 16 and central switching unit 22 perform the proposed function as addressed above.[70]

6.   **"Connecting the call from the calling party access number to the called party access number"[71] / "Means for connecting the call from the calling party access number to the called party access number"[72]**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction needed<br><br>Structure is central switching unit 22 | Connecting a first call to the called party with a subsequent second call to the calling party in a manner transparent to the calling party and called party.<br><br>Structure: Central Switching Unit 22 capable of |

---

[69] *See, e.g.*, '579 Patent at 5:29-31; '654 Patent at 5:24-26 ("call supervision status signal . . . will inform the central switching unit 22 as to [the] condition of the called location, *i.e.*, a busy condition, a no answer, or a call completion.").  *See also* '579 Patent at 7:10-15; '654 Patent at 7:5-10 ("If no answer occurs, switch 22 will terminate call 14 and may either send a "no answer" signal to data message means 24 and therefrom through channel 20 to local node 16 (see block 64) or, alternatively, may send no return message whatsoever.").

[70] *See* '579 Patent at 6:51-7:33; '654 Patent at 6:46-7:28; and Figs. 2 and 3 of both.

[71] '579 Patent, Claim 1.

[72] '579 Patent, Claim 5.

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| | initiating a reverse direction phone call and structural equivalents.<br><br>Function: Connecting a first call to the called party with a subsequent second call to the calling party in a manner transparent to the calling party and the called party |

Again, these terms require no construction.  The specification makes abundantly clear the plain and ordinary meaning of these terms.  (*See*, *e.g.*, '579 Patent at 5:37-39; '654 Patent at 5:32-34 (describing a preferred embodiment where the call from the calling party is connected to the called party by teleconferencing two separate calls from the central switching unit 22: "Thereupon, said second phonecall 38 and said first phonecall 37 are teleconferenced by central switching unit 22, thusly enabling the calling and called parties to communicate.").)

Defendants' construction improperly imports two limitations (call-bridging and transparency).  As explained in Section B.5 "determining . . .," *supra*, Defendants' call-bridging limitation ("connecting a first call to the called party with a subsequent second call to the calling party") seeks to effectively conflate a broader independent Claim 1 with a narrower dependent Claim 4 (which expressly contains the relevant call-bridging language).[73]  Defendants' transparency limitation ("in a manner transparent . . .") further seeks to conflate Claim 1 with dependent Claim 6.[74]  Adding these limitation would violate the canons of claim construction

---

[73] Claim 4 states:  "A method according to claim 1 wherein the step of connecting the call comprises the steps of:  (f) in response to said status signal, initiating a first phone call from said control location to said called party identification number and a second phone call from said control location to said calling party identification number; and (g) bridging said first and second phone calls." '579 patent at 8:20-27.

[74] Claim 6:  A method of use . . . comprising the steps of:  . . . (d) connecting the call from the calling party access number to the called party access number via the selected transmission path in a manner transparent to the calling party and the called party . . . ('579 patent at 8: 48-54).

("[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Phillips*, 415 F.3d at 1314.

Defendants propose a structure of central switching unit 22 capable of initiating a reverse direction phone call and structural equivalents as the means for performing the proposed function which was addressed above. AIP agrees that central switching unit 22 is the relevant structure. However, Defendants improperly add a limitation as to the capabilities of central switching unit 22. The specification of the '579 and '654 Patents does not so limit the central switching unit. While the embodiments described therein may describe the central switching unit 22 as initiating a reverse phone call to the calling party, be it after receiving an answer from the called party or simultaneously with initiating a call to the called party, it is improper to import such a limitation into the claims. *Liebel-Flarsheim*, 358 F.3d at 906.

### 7.   "An intercept" / "The intercept"[75]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Device for intercepting and directing a transmission | A device that transparently reroutes a phone call from its intended path to an alternative path. |

AIP's proposed definition of the term "intercept," which is a "device for intercepting and directing a transmission," is fully supported by the specifications of the '654 and '756 Patents:

> This software [associated with local node 16] . . . shows . . . the interception of the call from location call 12 by local node 16 . . . if the call is accepted, node 16 will then proceed to acquire the destination number. . . local node 16 will decide whether or not to terminate the call completely, to use a different network, or to use the PTT . . . .

('654 Patent at 6:46-7:2); and

---

[75] '654 Patent, Claims 1 and 5; '756 Patent, Claim 8.

> The normal transmission from an access device is intercepted by
> an intercept device, which routes the transmission to a central local
> node.

('754 Patent at 9:26-30.)[76]

In contrast, Defendants' proposed definition includes multiple elements not supported by any evidence in the intrinsic record in an improper attempt to self-servingly narrow the definition. *First*, Defendants' definition renders part of the claim superfluous, because the express language of at least Claims 1 and 5 of the '654 Patent already includes a limitation of a "in a manner transparent . . . ."[77] Importing the term "transparently" into a definition of the "intercept" itself would render the "transparent" phrase redundant in the claim. *Second,* Defendants add a term "phone call" (as opposed to a "transmission" that is used in the intrinsic record and the claims), thereby excluding other transmissions contemplated by the '654 and '756 Patents, *e.g.*, those carrying fax and paging communications.[78] *Third*, Defendants assert the existence of an "intended path" from which the intercept "reroutes" to "an alternative path," which has no support in the claims or the specification. Rather, the invention contemplates that a path may be *selected* by a central local node *after* receiving a transmission from an intercept (*i.e.*, *after* the transmission is initiated), when the transmission is "routed based on the results from an evaluation of all available communication networks." ('756 Patent at 1:61-62.)[79]

---

[76] *See also* Claim 5 of the '654 Patent and Claim 7 of the '756 Patent ("an intercept that selects a route . . .").

[77] '654 Patent, Claim 1, at 7:59-65; Claim 6, at 8:30-35.

[78] *See, e.g.*, '756 Patent at 6:51-56 ("For sending faxes, the calling party sends a fax into a central local node…"); *Id.* at 12:15-17 (FIG. 7B works in the same way as in FIG. 7A, except that node 154 pages the called party via paging device 158 over paging network 176).

[79] *See also* '756 Patent at 2:65-3:2 ("In routing communications, the control location takes into consideration customer defined preference criteria relating to preferences for particular types of communication network, transmission quality, cost, security, and priority of transmission.").

8.      **"Selecting a transmission path connecting a calling location and a called location"**[80]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction needed. | Deciding whether to signal the called party through a data network instead of through the voice network. |

No construction is necessary for this term other than its plain and ordinary meaning of selecting a path of transmission that connects the calling and called locations.  (*See, e.g.*, '654 Patent, Figures 2-3 (steps 54 and 56 showing the selection of the path through a choice of networks).)[81]  As a preliminary matter, Defendants' definition departs from the plain meaning of the term and improperly changes the (calling and called) *locations* to the (respective) *parties,* without any explanation or support therefor.  Further, Defendants interpret the "transmission path"[82] to mean a "signal" that is sent "through a data network instead of through the voice network," an obvious attempt to limit the claim to an embodiment from the specification, thereby contradicting the patent that contemplates other networks.  (*See, e.g.*, '654 Patent, Figs. 2-3 (step 61 references a "different network" (from voice network 10 or channel 20), PTT, etc.).)  The end-result is an unrecognizable construction and, as such, should not be adopted.

---

[80] '654 Patent, Claim 1.

[81] '579 Patent at 6:53-63; '654 Patent at 6:48-58 ("This software . . . shows, in block 54 thereof, the interception of the call from location call 12 by local node 16. As above noted, node 16 will then use its database to determine whether or not to accept the call for purposes of the present international call back method and system. If node 16 rejects the call, it will be routed to the local PTT as is indicated in block 56. However, if the call is accepted, node 16 will then proceed to acquire the destination number, that is, the called party identification number . . . as is indicated by block 58.").

[82] Defendants also equate "transmission" with a "call," an argument that is addressed further above (Section B.7, "An intercept" *supra*) and incorporated herein by reference.

9

**9.** **"An intercept that selects a route passing through a control location for connecting a calling party telephone user equipment to a called party telephone user equipment"[83]**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Intercept is a device for intercepting and directing a transmission.

Otherwise, no construction needed. | An intercept that decides whether to signal the called party through a data network instead of through the voice network. |

For these terms, AIP proposes that only an "intercept" be construed as "a device for intercepting and directing a transmission." The remaining terms need no construction other than the plain and ordinary meaning, which is supported by the intrinsic record.[84] Defendants' proposed definitions unnecessarily complicate these straightforward terms.

AIP incorporates herein by reference all the arguments laid out in Section B.8, above ("selecting . . ." *supra*) (since Defendants here equated the "telephone user equipment" to the "parties," just like they equated "locations" thereto in Section B.8).

**10.** **"Access location"[85]**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction needed. | End-user device that is the ultimate initiator or ultimate destination of the transmission. |

No construction is necessary for this term other than its plain and ordinary meaning, which is supported by the intrinsic record.[86] Defendants' proposed construction of this term as

---

[83] '654 Patent, Claim 5.

[84] *See, e.g.*, '654 Patent at 4:63-5:34; 6:59-7:2; Figures 1-3 (illustrating how a "local node" may intercept and direct a transmission). "[A] phonecall 26 originating from caller location 12 is acquired at local node 16 . . . . Local node 16 then refers to a database which advises it whether to attempt to route the call through channel 20 or whether to employ the conventional communications network 10." *Id.* at 4:63-5:2.

[85] '756 Patent, Claim 8.

[86] *See, e.g.*, '756 Patent, Claim 8b (checking the status of each of a plurality of access locations). *See also id.* at 1:11-22 and 5:17-27 (evaluating different access locations to determine where the called party can be reached).

an "end-user device that is the ultimate initiator or ultimate destination of the transmission" has

no support in the intrinsic record.  *First*, the claims and specification make clear that the "access

location" is different from an end-user device.  For example, '756 Patent, Claim 8(d) checks for

authorization to allow communications *through* at least the identified access location.[87]

Allowing the communication "through" the access location (and converting that communication

from one form to another) distinguishes the access location from the end-user devices.

Moreover, the specification confirms that access locations are different from end-user devices,

since it refers to them separately:

> [T]he node at the called party having the main identification or
> number associated with the called party checks the status of each
> of these communication networks *at different access locations* to
> determine whether any are being accessed by the party at that
> time. . . For instance, the check may reveal that the called party's
> *computer is logged in* or that the *phone is hooked up*, etc.

('756 Patent at 5:19-29 (emphasis added).)[88]

 *Second*, nothing in the specification or claims supports Defendants' proposed additional

limitation of the "access location" being an "ultimate initiator or destination of the transmission."

Defendants do not and cannot point to any language that supports this interpretation.  The

Federal Circuit "has repeatedly and clearly held that it will not read unstated limitations into

claim language."  *N. Telecom.*, 215 F.3d at 1290-91 (Fed. Cir. 2000).

---

[87] *See also* '756 Patent, Claim 11 ("a router. . . to route. . . communications *through*. . . one of
said access locations") (emphasis added).  *But see* '756 Patent, Claim 9 (which addresses the
changing of the route before the transmission "**to**" the access location is completed).

[88] *See also* '756 Patent at 5:51-67 ("Assume that the [called] party spends half the year in North
America using NACM cellular network and the remainder in Europe using GSM internet
network hookup. . . in accordance with the invention. . . both nodes check their respective
cellular systems to locate on which the party is or has been accessing or which has been turned
off.").

11.     **"Checking a status on each of a plurality of communication access
locations each associated with said called party access number to
determine which is accessible"[89]**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction needed. | Checking availability for each of a plurality of access locations prior to initiating a call to the called party. |

This term also requires no construction other than its plain and ordinary meaning of checking a status of each access location associated with the called party access number to determine if it is accessible (to reach the called party access number).  (*See, e.g.*, '756 Patent at 5:18-24 ("Upon receipt of a request inquiring as to the availability of the party to receive a communication, the node at the called party . . . checks the status of each of these communication networks at different access locations to determine whether any are being accessed by the party at that time.").)

Defendants' definition seeks to rewrite this term in three ways.  *First*, they substitute the words chosen by the Patentee—"checking a status on . . . to determine which is accessible"—with "checking availability for."  Yet, the specification clearly shows that the Patentee focused on the *status of access locations*,[90] on the one hand, and on the *availability of a party*, on the other.  (*See* '756 Patent at 5:18-19 ("Upon receipt of a request inquiring as to the availability of the party to receive a communication . . .").)

*Second*, Defendants remove the express limitation that each access location is "associated with said called party access number," without any apparent explanation.  In other words, Defendants' construction renders this phrase superfluous and meaningless.  *Randall May Int'l, Inc. v. DEG Music Prods., Inc.*, 378 Fed. Appx. 989, 998 (Fed. Cir. 2010) ("The district court's

---

[89] '756 Patent, Claim 8.
[90] '756 Patent at 5:62-64 ("check. . . on which [cellular networks] the party is or has been accessing or which has been turned off").

elision of the claim limitation (supported by the specification) . . . is legal error because all the limitation [*sic*] in a claim must be considered meaningful.") (citing *Cablestrand Corp. v. Wallshein*, 29 F.3d 644 (Fed.Cir.1994)).

*Third*, Defendants also inject a limitation requiring the checking to occur "*prior to* initiating a call," which is neither explicitly, nor implicitly, supported by the claim language, and is actually contradicted by the specification of the '756 Patent, which includes embodiments where the checking occurs subsequent to initiating a call.[91]

## V.    CONCLUSION

For the above reasons, Plaintiff respectfully requests that the Court adopt its proposed constructions.

November 19, 2013

OF COUNSEL:

COHEN & GRESSER LLP
Karen H. Bromberg
Francisco A. Villegas
Damir Cefo
800 Third Avenue
New York, New York 10022
(212) 957-7600
kbromberg@cohengresser.com
fvillegas@cohengresser.com
dcefo@cohengresser.com

BAYARD, P.A.

/s/ *Stephen B. Brauerman*
Richard D. Kirk (rk0922)
Stephen B. Brauerman (sb4952)
Vanessa R. Tiradentes (vt5398)
Sara E. Bussiere (sb5725)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE  19899
(302) 655-5000
rkirk@bayardlaw.com
sbrauerman@bayardlaw.com
vtiradentes@bayardlaw.com
sbussiere@bayardlaw.com

*Attorneys for Plaintiff in C.A. Nos. 12-1688-1692-GMS*

---

[91] *See, e.g.*, '756 Patent at 2:27-36.  "The inventive system may have a control location that receives both a calling party and a called party access number or identification [when the communication is initiated].  After receiving these access numbers, the system initiates an inquiry to the called party from the control location and waits for a status signal as to the called party location's availability to take incoming calls."  '756 Patent at 6:8-16 ("The central local node polls the called party nodes to locate the network which the called party is accessing.  For instance, one called party node may be programmed with access information on all the possible networks that the called party may be using, e.g., cellular, computer, paging, etc.  This called party node then searches to find where the called party is or is likely to be . . . .").

MORRIS JAMES  LLP

___/s/   Kenneth L. Dorsney___
Kenneth L. Dorsney (#3726)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
kdorsney@morrisjames.com
*Attorneys for Plaintiff in C.A. Nos. 12-617-*
*GMS*